IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:04 CR 3036 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| BILL LEE SMITH, | ) | REPORT AND RECOMMENDATION |
| | ) | |
| | ) | |
| Defendant. | ) | |

A hearing was held before me on June 2, 2005 on the defendant's motions to suppress and to dismiss and, by agreement, the defendant's supplemental motion to suppress and dismiss. Having now heard and considered the evidence, I now recommend that all the defendant's motions be denied.


FACTS

In September, 2003 Sargent Glenn Elwell of the Nebraska State Patrol ("NSP") Drug Enforcement Unit was told a Carolyn Dewey of Lincoln, Nebraska had information she believed would be of interest to law enforcement.  Sgt. Elwell met with her shortly thereafter at her residence.   In addition to Mrs. Dewey and Sgt. Elwell, her husband, Clay Dewey, and NSP Investigator Matt Brodkey were also present.   During the conversation Carolyn Dewey mentioned her father several times and referred to him as a "life-long drug dealer," but her father's name was not mentioned.

At some point during the ensuing winter Elwell received a telephone call from Carolyn Dewey. In response, Elwell and Brodkey met again with her and her husband on January 29, 2004. During this conversation Carolyn Dewey's father, the defendant, was named. Carolyn Dewey was upset because her son and his girlfriend and their infant child were living with her father in Oklahoma. She told the officers her father was involved in methamphetamine manufacturing, selling, and using. Clay Dewey also stated that on the last several occasions defendant had visited Nebraska, he had had family members buy Sudafed at Wal Mart stores. Sudafed contains pseudoephedrine, a precursor for manufacturing methamphetamine. Elwell advised them that the only thing he or NSP could do would be to relay that information to proper authoriti8s in Oklahoma, and that the only way NSP could be involved would be if the defendant did anything in Nebraska, for example, having them buy Sudafed for him again. He also told them that if they wanted to do that, they would have to devise a "mock story scenario" perhaps using Clay Dewey as a participant. They discussed a possible mock story to the effect that Clay had a brother who lived in Kearney, Nebraska and worked at a Wal Mart Store that was closing out its outdated Sudafed, and perhaps the defendant might be interested in buying some of it. Also at this meeting, Elwell advised the Deweys that if Clay chose to take action for NSP, he would have to agree to some "ground rules," and that NSP would pay him for this work.

Late in the week of February 2-6, 2004 Clay Dewey contacted Inv. Brodkey and advised him that the "situation had evolved," and he was ready to do something. On February 9, 2004 Elwell and Brodkey met with Clay Dewey and discussed the "ground rules" mentioned in their previous conversation, and, after discussing them Clay Dewey signed the consent form agreeing to work for NSP as

a cooperating individual. Exhibit 1. Clay Dewey said that he had had two phone conversations with the defendant, and defendant had indicated he was interested in the expired Sudafed. Elwell and Brodkey decided that the next step would be for Clay Dewey to again telephone defendant about lining up the purchase, and the call would be recorded.

Clay Dewey placed two recorded phone calls to the defendant on February 17, 2004. They tentatively set up a "deal" for the Sudafed, eventually concluding that the purchase would take place on February 23. Again on February 19 Clay Dewey placed a recorded phone call to defendant to arrive at a final agreement: Defendant would purchase 900 boxes of 24-count, 30 mg. tablets for $1,000.00, half of which would be in the form of one ounce of methamphetamine. The exchange was to take place in Lincoln, using a "dummy vehicle" at a local storage unit. Clay Dewey told defendant that Clay's brother would put the pills in the vehicle and store it in a storage facility. When defendant came to Lincoln the key to the unit would be given to Clay, who would then accompany defendant to the unit and make the delivery.

At no time in these phone conversations was there mention of the defendant's wife or the baby, Carolyn Dewey's grandson, accompanying defendant to Lincoln. In fact, Elwell testified that the officers considered it a "worst case scenario" if defendant were accompanied.

The transaction did not occur on February 23 as planned, but did occur on February 24. About an hour before defendant's arrival he called Clay Dewey and at that time the officers first learned that defendant was accompanied by both his wife and the baby.

Later that day the controlled delivery occurred as planned. Defendant paid Clay Dewey the $500.00 at the Dewey residence, and in the course of the transaction Clay Dewey had several recorded conversations with defendant.  At one point defendant told Clay how to make meth, and he invited Clay to  Oklahoma to watch and learn how to make it.  Although defendant did not have the total one-ounce quantity of meth, arrangements were made for delivery of the remainder.  At the storage unit some meth was given to Clay Dewey, and he placed it in the trunk of the vehicle for his "brother" to retrieve, as he had previously been directed by the officers.  Sgt. Elwell did not remember any of the recorded conversations including mention of the baby, Carolyn's grandson. At the storage unit Clay Dewey unloaded all the boxes of pills from the dummy vehicle and placed them in the trunk of his own vehicle which he had driven to the scene.  Defendant held open the unit's garage door; he did not touch any of the boxes.

Once the boxes had been transferred, a SWAT team descended on the pair.  Defendant was arrested; the officers also conducted a "mock arrest" of Clay Dewey.  Later defendant's vehicle was searched and was found not to contain any drugs.  Defendant's wife was arrested for possession of methamphetamine, for meth found in her purse.  The baby was given to Carolyn Dewey.

DISCUSSION

Defendant challenges the government's evidence on several grounds.  First, in the motion to suppress, defendant claims the government violated 18 U.S.C. §§ 2511(c) and 2515 "when law enforcement recorded the [several] telephone conversations without first obtaining the consent of the confidential informant."

4

Defendant's Motion to Suppress, filing 55, Paragraph 3. The evidence established, however, that the officers had explicit permission to record the calls by virtue or the express provisions of the "Nebraska State Patrol Cooperating Individual (CI) Agreement," Exhibit 1, Paragraph 11, which states in part:

> I agree to:
> * * *
> - Be equipped with a transmitting or recording device.
> - Allow officer(s) to listen to and record my phone conversations with suspects.

Sgt. Not only did Clay Dewey sign this agreement, but he also initialed each paragraph, as did Inv. Brodkey, and the initialing took place after each provision had been discussed. The contention that no consent was obtained is spurious.

Second, defendant claims in his motion to dismiss that this prosecution followed defendant's arrest on identical state charges arising from the same events and violates defendant's Due Process rights, as well as the Double Jeopardy Clause of the Fifth Amendment. Pointing out that the matter was investigated and prosecuted entirely by state, rather that federal, officers and attorney, defendant argues that this prosecution is a "sham" for a state prosecution which was dismissed.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." However, in respect to a similar state-federal prosecution, the Eighth Circuit has stated:

> There can be no double-jeopardy violation unless jeopardy has attached during a prior prosecution. See <u>Serfass v.</u>

> United States, 420 U.S. 377, 391, 95 S.Ct. 1055, 1064, 43 L.Ed.2d 265 (1975). "Jeopardy attaches to a prosecution when the jury is empaneled and sworn or, in a nonjury case, when the court begins to hear evidence." United States v. Bailey, 34 F.3d 683, 687 (8th Cir.1994); see also United States v. Miller, 23 F.3d 194, 198 (8th Cir.) ("[J]eopardy does not attach until the jury is empaneled and sworn."), cert. denied, 513 U.S. 877, 115 S.Ct. 207, 130 L.Ed.2d 137 (1994). Because the California conspiracy charges were dismissed, jeopardy never attached in the prior state proceeding on those charges.

U.S. v. O'Conner, 64 F.3d 355, 360 (8th Cir. 1995). Cf., U.S. v. Givens, 88 F.3d 608, 611 (8th Cir. 1996)(Retrying a defendant after a mistrial implicates double jeopardy because jeopardy attaches when the first jury is sworn). The cases cited by the defendant (as well as the government's reliance on United States v. Johnson, 169 F.3d 1092 (8th Cir. 1999)) involve successive prosecutions. Since the state charge involved in the defendant's case was dismissed and not prosecuted, jeopardy never attached, and the defendant's Double Jeopardy claim must fail.

Finally, defendant's supplemental motion (filing 95) raises several allegations and claims:

> a) Elwell had no jurisdiction to cross state lines by directing phone calls be made from Nebraska to defendant in Oklahoma;
>
> b) Elwell had no authority to record telephone conversations across state lines; and
>
> c) The actions of NSP and Clay Dewey were "outrageous government conduct" in violation of the Due Process Clause of the Fifth Amendment.

There is no evidence or authority before the court that would support any of these claims. No special authorization is needed for a law enforcement officer to request and/or record interstate

phone calls, and doing so is not outrageous.  These claims also lack any merit.

    IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States District Judge, that the motion to suppress and to dismiss, filing 48, the motion to suppress recorded phone conversations, filing 55, and the motion to dismiss, filing 58, all be denied in all respects.

    The parties are notified that the failure to object to this recommendation as provided in the local rules may waive any right to appeal the district judge's adoption of the recommendation.

    FURTHER, IT HEREBY IS ORDERED:  Trial of this case is set to commence at 9:00 a.m. on July 18, 2005.  Jury selection will be held at commencement of trial.  Trial is scheduled for a duration of three trial days.


        DATED June 10, 2005

                        BY THE COURT:


                        s/ David L. Piester
                        United States Magistrate Judge

7